## The D. M. Anthony. (Four Cases.)

*(District Court, S. D. New York.   February 3, 1882.)*

1. COLLISION—SAILING-VESEL—TUG AND TOW.
    Where a tug with boats in tow, lashed upon each side of her, being in all 130 feet wide, was proceeding up New York bay at about two knots an hour, and the schooner D. M. A. came up from behind upon a course about north by east, at the rate of six to seven knots per hour, and was sailing close-hauled by the wind, which was about north-west, but variable, and approached the center of the tow to within 200 yards and headed nearly directly upon the tow, and designed to go to windward, but, being unable to do so, ported her helm in order to go to leeward, and in so doing came into collision with the stern of the tow, sinking some of the boats and injuring others, *held*, upon contradictory evidence, that the facts were as above stated, and that the schooner was alone in fault in coming too near to the tow before properly shaping her course to avoid it.                                                                    •

In Admiralty.

*Beebe, Wilcox & Hobbs*, for libellants Malloy & Donovan.

*J. A. Hyland*, for libellants Thompson & Herbert.

*Owen & Gray*, for claimants.

BROWN, D. J.   These libels were filed to recover damages growing out of a collision on the twenty-third day of November, 1880, arising from the schooner D. M. Anthony running into the stern of the tow of the steam-tug David C. Cox.   The steam-tug left Port Johnson at about 7 A. M. with a tow consisting of three canal-boats loaded with coal lashed to her starboard side, and two lashed to her port side, bound for the East river.   The tow projected somewhat astern of the tug. After rounding the buoy to the south of Robbins Reef light she had straightened up on her course, heading for the battery, and had got about one-third the distance to Bedloe's island, when the D. M. Anthony, coming up from behind, intended to pass on the port side, but changed her course when about twice her length astern of the tug and attempted to pass to starboard.   In making this attempt she ran in between the sterns of the two outside boats of the tow, on the starboard side, sinking them almost immediately, and injuring the boat next to the tug.   These libels are filed by the owners of the boats, cargo, and other personal effects lost or injured by the collision; two of the libels being against the D. M. Anthony alone, and two being against both the schooner and the tug, and charging both with fault.

The collision was at 9 o'clock in the morning, in clear weather, under a fair wind, in ample sea-room, and without any obstruction

to navigation. It could only have occurred, therefore, from some inexcusable carelessness of one or both vessels. The tug was proceeding slowly, encumbered by an unwieldy tow; the schooner was following more rapidly, in nearly the same course, and with a broad space for navigation. It is conceded that it was the duty of the tug to keep her course, and the duty of the schooner to keep out of the way. The only defence of the schooner is that when she had approached to within about 100 yards of the tug, the latter suddenly put her helm to starboard, thus going to port and directly in the way of the schooner's course; that the schooner, upon the course she had been pursuing, would, but for this change by the tug, have gone clear by some 25 or 50 yards on the port side; that this change by the tug necessitated the schooner's attempt to pass to starboard, which was unsuccessful; and that the whole fault was therefore on the tug. On the part of the tug it is asserted that she made no change of course whatever, and that the sole fault is in the schooner.

The D. M. Anthony was a three-masted schooner, about 125 feet in length. The night previous she had anchored near Sandy Hook, and on the morning of the 23d was proceeding up the bay, bound for Hoboken, on the North river. From the Narrows her ordinary course would be N. by E. ½ E., and the answer alleges that she kept steadily on her course. The ordinary course of the tug, after rounding the Robbins Reef buoy, would be N. E., and there was no reason for her to vary from it. The wind, according to all the witnesses from the schooner, was variable, from N. W. to W. N. W.; she was sailing by the wind, close-hauled, upon her port tack; and as, by their testimony, she could keep within four points of the wind, she could easily have made, from the Narrows, her desired course of N. by E. ½ E.

According to the testimony of those on the tug and tow the wind was variable from N. W. to N. N. W., and the schooner was sailing free just prior to the collision. The captain testified that at half past 8, when in the Narrows close to the easterly shore, he saw the tug some two or three miles off, upon his port bow, heading a little across his course to the eastward; that his instructions to the wheelsman were to sail by the wind, which was done; that as he approached the tug these instructions were repeated, directing the schooner to be kept close to the wind and "close at it," in order to pass to windward, and that he would have gone clear but for the change in the course of the tug to port when two or three lengths distant; that he

saw the pilot of the tug make this change of his wheel, and that he thereupon ported his helm and let go the spanker, so as if possible to pass to leeward, and that the collision occurred just as the schooner began to pay off; that she was making about three knots per hour, and the tug about two and one-half knots. The mate and wheelsman testify to the same effect; and all on board say that the schooner was making only about three knots. The captain also says that when passing Robbins Reef light he was about one and one-half miles to the east of it, over towards the Long Island shore. The mate testified that he was acting as lookout; that he had given directions in regard to the sails; that just prior to the collision he had been walking fore and aft to keep warm; that the schooner, sailing close-hauled, would not come into stays in less than 300 yards, nor pay off much in less than 200 yards. One of the hands testified that when within about two or three lengths of the tug he could see clear under the stern of the tow on the port side.

On the part of the tug it was testified by the pilot and engineer that there was no change of course, and no change of the wheel except such as was necessary to keep the tug straight upon her course. The pilot said that he saw the schooner in the Narrows nearly astern; that he did not notice her again until about two or three lengths off, when he turned around and saw her nearly directly astern, and coming directly upon him; that he blew several blasts of the whistle twice. These blasts were recognized by several persons on the tow as signals of danger, and their attention thereby immediately directed to the schooner. They all say that the schooner was then two or three lengths off; that she was almost directly astern of the tug, a little to starboard, and coming nearly directly upon them. Those on the starboard boats testify they could see most of her starboard bow; a witness on the extreme port boat said he could see most of her port bow. The lookout on the tug says the schooner was at this time a little off his starboard quarter, coming straight upon them. The captain, mate, and wheelsman of the schooner do not, on the whole, contradict this statement, but rather confirm it. The captain says that the tug, at the time her course was changed, was right ahead of him; he saw two of the boats on the starboard bow, and one on the port. The mate says when they got close up, pretty near, she was right straight ahead, and that they were "heading pretty near right ahead onto her;" could see some of her boats on each bow. Drowne, the man at the wheel, says the tug was at that time about

a point off his port bow, and that he could see her boats over each bow. Two deck hands say the same.

From this testimony it is plain that, before adopting a course giving a sufficient margin for passing the tug and tow in safety, the schooner had approached them to within about 100 yards, somewhat to the starboard of the tug herself, and heading nearly directly upon her. I am satisfied that this near approach of the schooner in that position, and on the course she was pursuing, was the primary and sole cause of the collision. According to the testimony of her own witnesses she was sailing by the wind; the wind was variable and she was close-hauled; the tug and tow were about 130 feet wide, and if she could not come into stays short of 300 yards, as her mate testifies, such near approach to the tug and bearing directly upon her was hazardous and unjustifiable. The tow presented so much breadth in front of her that at the distance of 100 yards the schooner must have followed a course at least two points nearer the wind than the tug in order to go clear to windward; and if she were already close-hauled and sailing by the wind, as her witnesses say, she could not have luffed so much without coming nearly into stays, which her mate says would take 300 yards.

The very evident and egregious mistakes, to say the least, made by those on the schooner in their testimony as to her rate of speed, in which they all agree, detracts much from the weight to be given to their testimony in other respects. The tug was going but about two knots per hour, and had the schooner been going but three knots, as they all say, the collision could not have happened anywhere in the neighborhood of where it occurred, nor, in fact, could it have happened at all. For the tug was seen from the schooner at half past 8 o'clock, says the mate, at 8:15, says the captain, some three miles off, when the schooner was in the Narrows; and the schooner, if she was sailing at the rate of three knots an hour only, could not have overtaken the tug until she had passed the Battery; whereas the collision was some three miles below it. As the collision was between one and two miles below Bedloe's island, and took place, as the mate testified, when it was just 9 by their clock, the schooner had reached this point from the Narrows in from half to three quarters of an hour, and the distance is very nearly four miles. The schooner was, therefore, going from six to seven knots per hour. The tug had left Port Johnson at 7, and had made four miles at the time of the collision, or two knots per hour. The witnesses from the tug said there was an eight-knot breeze; and, as the tide was ebb,

the progress of the schooner would show that they were not far from correct in this estimate.

The statement of the captain, that when he passed Robbins Reef light he was a mile and a half to the eastward of it and over towards the Long Island shore, would be of some importance, if true, as indicating the course of the schooner in reaching the place of collision, the large westward divergance of her course from that of the tug, and the consequent reasonable expectation of passing to windward. But this statement is utterly incompatible with the answer, and with all the other testimony in the case. To reach a point so far to the east of the light would require her course to be about N. N. E. from the Narrows, and a change to nearly N. W., in order to reach the place of collision,—a change of nearly six points. The last course was nearer the wind than she could possibly have sailed, being nearly directly into the wind, and wholly off her course for Hoboken.

There is no reason to suppose that the schooner did not come up from the Narrows upon her natural course without any other changes than arose from the variable wind. This course was N. by E., and as she sailed by the wind close-hauled the wind was probably varying as much to the north of N. W. as to the west of it. Nor would she otherwise have been nearly following the course of the tug, as it appears she was, when within 100 yards of her.

The statement of the captain and others on the schooner that they saw the man in the pilot-house of the tug starboard his helm when 100 yards distant, is, I think, incorrect. The smoke-stack was directly behind the pilot-house and within a few inches of it, and it obscured any correct observation of the man at the wheel from behind; nor at the distance of 100 yards astern could his motions be correctly observed from the side without placing the schooner much further on the starboard side of the tug than her own witnesses state, and further even than I find the proof on the part of the tug to warrant. The ordinary movements of the pilot in keeping the tug steady might also be easily mistaken. The force of the collision upon the starboard side would naturally turn, and did turn, the whole tow around to port, and this change is, I have no doubt, what was in the minds of the witnesses, and what they have misplaced in time as occurring just before the collision.

Those on board the tug emphatically deny any change of course prior to the collision. It also appears that no considerable change of course of a tug and tow so cumbersome and going so slowly could be made short of 10 minutes. The change of course alleged is a

change by starboarding the helm when only 100 yards ahead of the schooner. Now this distance must have been made by the schooner, at the rate she was sailing, in less than a minute—a time too short to admit of any appreciable change in the tug's course, even had her helm been starboarded as alleged; while the impact of the schooner at the moment of collision, right between the sterns of the two starboard boats, shows that there could not have been much, if any, change in the course of the outer boats of the tow which would have exhibited such a change, at the most, if there had been any change.

The statements in two of the libels that the tug did change her course was sought to be corrected by those libellants on the hearing. Their own evidence is doubtless much weakened by this variation in their statements. But the errors of these libellants are not attributable to the tug, and are no estoppel upon her defence in these two libels in which she is joined as a defendant. I am satisfied that the tug did not contribute to the collision by any fault on her part.

In the two cases of Malloy & Donovan against the D. M. Anthony alone, decrees will be entered with costs; in the two cases of Thompson & Herbert against the schooner and the tug, the libels will be dismissed with costs as respects the tug, and decrees with costs will be entered against the schooner.

A reference will be made in each case to compute the damages.